1

2

3

4

5

6

7

8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

9

10   ADIL LAHRICHI,

11                          Plaintiff,

                                                          CASE NO. C04-2124C
12            v.
                                                          ORDER
13   LUMERA CORPORATION, a Delaware
     corporation; MICROVISION, INC., a Delaware
14   corporation; and THOMAS D. MINO,

15                          Defendants.

16

        This matter comes before the Court on (1) Defendants Lumera Corporation's and Thomas D.

17   Mino's Motion for Summary Judgment ("Defs.' Mot.") (Dkt. No. 55), Plaintiff's Response ("Pl.'s

18   Opp'n") (Dkt. No. 92), and Defendants' Reply ("Defs.' Reply") (Dkt. No. 98); and (2) Defendant

19   Microvision's Motion for Summary Judgment ("Microvision Mot.") (Dkt. No. 67), Plaintiff's Response

20   ("Pl.'s Opp'n to Microvision") (Dkt. No. 88), Defendant's Reply ("Microvision Reply") (Dkt. No. 106),

21   and Plaintiff's Surreply ("Pl.'s Surreply") (Dkt. No. 110).  The Court has considered the papers

22   submitted by the parties and determined that oral argument is unnecessary.  The Court hereby finds and

23   rules as follows.

24   //

25

26   ORDER – 1

I.    **BACKGROUND: FACTS AND ALLEGATIONS**

Plaintiff has brought race and religious discrimination claims under Title VII of the Civil Rights Act of 1964, § 703, 42 U.S.C. § 2000e-2; the Washington Law Against Discrimination ("WLAD"), WASH. REV. CODE 49.60; and 42 U.S.C. § 1981 against Defendants Thomas Mino and Lumera Corporation. Plaintiff also has brought claims for intentional and negligent infliction of emotional distress against Defendant Mino. In addition, Plaintiff has brought a claim for negligent supervision against Defendant Microvision, Inc. Defendants Mino and Lumera seek to have the statutory discrimination claims and the intentional and negligent infliction of emotional distress claims dismissed either because the claims cannot be brought as a matter of law or, alternatively, because there are no genuine issues of material fact remaining for trial as to any allowable claims. Defendant Microvision seeks to have the negligent supervision claim dismissed on the bases that Microvision is not Mr. Mino's supervisor due to the corporate structures of Lumera and Microvision and, alternatively, that there is no underlying wrongful conduct for which Microvision could be liable.

Plaintiff Adil Lahrichi is an Arab-American and a practicing Muslim of Moroccan descent. He has a Ph.D. in Electrical Engineering, and was the Vice President of Technology Development for Defendant Lumera Corporation from March 2001 to April 2002. Defendants characterize Lumera as a "high-tech startup," created in 2000 and focused on electro-optic polymer technology development. Defendant Microvision develops "high-resolution, scanned beam display and imaging systems" that utilize "the company's proprietary silicon micro-mirror technology." (Defs.' Mot., McIntyre Decl. ¶ 2.) According to Defendants, Lumera is a subsidiary of Microvision, Inc.; according to Plaintiffs, Lumera is a division of Microvision. Both Lumera and Microvision are Delaware corporations headquartered in Bothell, Washington. Lumera currently employs 44 people.

As Vice President of Technology Development for Lumera, Plaintiff was "responsible for creating a technical plan (the 'roadmap') for the production" of a "10-gig electro-optic modulator—a device for use in optical networks and systems that would turn light on and off at a high speed using less power and

ORDER – 2

with better performance than existing technology." (Defs.' Mot. 3.)  This project "had two components:
developing the materials needed to produce the device and designing the device itself." (*Id.*)  Thus,
Plaintiff's role was to "'lead the technical effort'" on this major project as well as others. (*Id.*)  The
modulator "roadmap" was completed at the end of July 2001. (*Id.* at 5.)  Plaintiff's work on the
modulator team continued thereafter.  In addition to working on this specific project, Plaintiff was hired
to bring structure and efficiency to a "dysfunctional" technical team at Lumera.  All parties agree that
Lumera's technical team had many personnel and financial management problems before Plaintiff arrived.
He was hired to and did address these problems by making "sound decisions in purchasing," developing
"strategic alliances" and negotiating government contracts, and correcting "vendor errors, saving Lumera
$275,000." (Pl.'s Opp'n 4–5.)  Though Plaintiff did make some progress with personnel conflicts (*id.* at
5 & n.4), personnel problems remained, as discussed *infra*.

Todd McIntyre, the Senior Vice President of Business Development at Microvision, was the
acting "manager" for Lumera when Plaintiff was hired and during Plaintiff's first six months at Lumera.
Plaintiff was aware at the time of his own hiring in March 2001 that Lumera intended to employ a CEO.
However, until Thomas Mino was hired as Lumera's first CEO on September 4, 2001, Plaintiff was
Lumera's highest-ranking employee.  As such, not only did Plaintiff have project responsibility, but,
before Mr. Mino was hired, Plaintiff also "handled many aspects of Lumera's day-to-day management"
that went beyond his role as Vice President of Technology Development. (Defs.' Mot. 3.)  When Mr.
Mino was hired, he assumed many of the operational functions that Plaintiff had been handling, including
recruiting and purchasing.

Plaintiff was out of the country on vacation in September 2001.  When Plaintiff left, Mr. Mino had
not yet started work, and when Plaintiff returned in October 2001, Mr. Mino had been with Lumera for
almost a month.  Plaintiff characterizes the difference between the time before Mr. Mino began working
at Lumera and after as significant—whereas before Mr. Mino's arrival, Plaintiff's experience at Lumera
was "successful and productive" (Pl.'s Opp'n 1), it deteriorated quickly after Mr. Mino started.  This

ORDER – 3

1   downward progression ended in April 2002 when Plaintiff was "terminated."  In contrast, Defendants

2   characterize Plaintiff's time at Lumera as involving an increasing number of problems that began long

3   before Mr. Mino arrived as CEO and that required Mr. Mino's decision to "reassign" Plaintiff to a "non-

4   management position."  According to Defendants, this "demotion" was unacceptable to Plaintiff, so he

5   "resigned."  For purposes of summary judgment, Defendants concede that Plaintiff was "terminated."

6   (Defs.' Reply 1.)  Further, the distinction between demotion and termination is immaterial to ruling on the

7   instant motions, as both constitute "adverse employment actions."  Accordingly, the Court will refer to

8   the action as a "termination" or a "demotion" somewhat interchangeably.

9           Defendants allege various nondiscriminatory reasons for their adverse employment action against

10  Plaintiff.  First, Defendants assert that Mr. Mino began receiving complaints about Plaintiff's

11  "'micromanaging' and 'dictatorial' management style" soon after Mr. Mino started as Lumera's CEO.

12  (Defs.' Mot. 1, 4–5.)  Defendants allege that several employees "felt that Lahrichi was overbearing and

13  confrontational in meetings, unwilling to experiment with the science, and a micromanager."  (*Id.* at 4

14  (citing *id.*, Londergan Decl.; *id.*, Jin Decl.; *id.*, Parker Decl.; *id.*, Dinu Decl.; *id.*, Guan Decl.).)

15  Defendants claim that one reason Mr. Mino removed Plaintiff from his role as a manager was that

16  Plaintiff had proven himself ineffective in the midst of technical disputes, unable to stay above the "fray,"

17  and unwilling to "listen rather than talk" as he oversaw the scientific team and conducted meetings.  (*Id.*.,

18  Mino Decl. ¶¶ 14, 16.)

19          In addition to complaints Mr. Mino received, two employees also had complained to Mr.

20  McIntyre about Plaintiff even before Mr. Mino arrived.  (Defs.' Mot. 4.)  Examples of complaints after

21  Mr. Mino arrived include Plaintiff raising his voice in meetings and pounding his fist on his desk when

22  meeting with employees.  (*Id.*, Mino Decl. ¶ 14; Defs.' Reply, Curran Decl. Ex. K (Londergan Dep.)

23  50:5–10.)  In November 2001, Mr. Mino claims he met with Plaintiff to discuss the unacceptability of

24  Plaintiff raising his voice at technical meetings.  (*Id.*, Mino Decl. ¶ 14.)

25

26  ORDER – 4

1   Other specific complaints from Lumera employees center on Plaintiff's micromanaging behavior in

2   relation to chemistry and chemical experiments and processes.  Plaintiff is not a chemist, but according to

3   chemists at Lumera, including Timothy Parker and Dan Jin (Defs.' Mot., Parker Decl. ¶¶ 3–7; *id.*, Jin

4   Decl. ¶¶ 3–5), and photonics engineer Raluca Dinu (*id.*, Dinu Decl. ¶¶ 5–6), Plaintiff was too intent on

5   telling them how to do their chemistry and their experiments.  Plaintiff refutes the specific examples given

6   by Ms. Dinu and Mr. Jin, saying that he understood that they and the other scientists needed their

7   freedom and that their declarations are simply inaccurate.  (Pl.'s Opp'n, Lahrichi Decl. ¶¶ 13–14.)

8   Plaintiff implies that Mr. Parker is biased against Plaintiff and in favor of Mr. Mino because he drinks and

9   golfs with Mr. Mino.  (*Id.* ¶ 11.)

10   Plaintiff attempts to counter the "bad manager" theme by noting that these employees never

11   expressed their complaints to Plaintiff himself before this lawsuit began.  Further, he disputes the

12   accuracy of additional declarations of Lumera employees Hann-Wen Guan, Dianne Edfast, and Henry

13   Hu, as well as Defendant Mino regarding the complaints about Plaintiff as a manager.  Plaintiff cites

14   instances where he was successful in guiding employee interactions and acting as a collaborative manager,

15   pointing out compliments by several employees in this regard (Jeffrey Kressbach, Christopher Rippe, and

16   Galina Todorova) and statements by others that Plaintiff handled things appropriately with them (Tim

17   Londergan and Hann-Wen Guan), even if he had conflict with others.  (Pl.'s Opp'n 6 (citing *id.*, Frank

18   Decl., Ex. 5 (Kressbach Dep.); *id.*, Ex. 12 (Todorova Dep.); *id.*, Ex. 11 (Rippe Dep.); *id.*, Ex. 2 (Edfast

19   Dep.); *id.*, Ex. 7 (Londergan Dep.); Defs.' Mot., Guan Decl.).)

20   Regardless of the accuracy of the complaints from the scientists, however, Plaintiff does not

21   dispute that complaints about his management of the scientific and technical team were made to Mr.

22   Mino.  Moreover, Defendants assert that, as CEO, Mr. Mino had the prerogative to remedy internal

23   conflicts and deficiencies in morale by restructuring the "team."

24   A second factor that Defendants say went into the decision to demote or terminate Plaintiff was

25   his effect on another Lumera employee who decided to quit.  Henry Hu, a valued Lumera chemist

26   ORDER – 5

1  according to Defendants, left the company in December 2001. Defendants allege that Mr. Hu's departure

2  was in part due to his "clashes" with Plaintiff. (Defs.' Mot. 9.) Plaintiff does not deny such clashes, but

3  counters that Mr. Hu submitted his resignation in December saying that he had accepted a job in October

4  2001 in Washington, D.C., and that his resignation thus could not possibly have been a result of a conflict

5  with Plaintiff that allegedly occurred sometime in December 2001. (Pl.'s Opp'n 10.) Further, it is

6  undisputed that Lumera had problems with Mr. Hu before Plaintiff was hired. (*Id.*, Frank Decl. Ex. 8

7  (McIntyre Dep.) 67:16–21.) Defendants also acknowledge that Plaintiff did manage some problems with

8  Mr. Hu (*id.* at 90:2–23), and that Mr. Hu had other reasons for leaving Lumera that had nothing to do

9  with Plaintiff, such as family and job location (*id.*, Mino Decl. ¶ 20). Nevertheless, Mr. Hu declares that

10 Plaintiff harassed him and set unrealistic deadlines and quantity requirements. (Defs.' Reply, Hu Decl. ¶¶

11 3–6.) Further, Mr. Mino declares that, frustrated by Plaintiff's management style and Hu's departure,

12 which he viewed as being partially caused by Plaintiff's ongoing interactions with Hu, he "began to think

13 about taking [Plaintiff] out of a management role" at the end of December 2001. (Defs.' Mot., Mino

14 Decl. ¶ 22.)

15        In addition to dissatisfaction with Plaintiff's management style and interpersonal relational skills,

16 Defendants assert that Plaintiff missed a significant project deadline. The deadline was aggressive by all

17 parties' accounts, and involved producing a prototype of the 10-gig electro-optic modulator 90 days from

18 November 2001. Mr. Mino was frustrated by Plaintiff's lack of participation in meetings and felt that

19 Plaintiff was not taking ownership of the project by that point. (Defs.' Mot. 9.) Plaintiff emphasizes, and

20 Defendants concede, that this missed February 2002 deadline was not just Plaintiff's fault—rather, it was

21 a "failure of the whole team." (*Id.*, Mino Decl. ¶ 26.) Nevertheless, Mr. Mino saw the failure as

22 indicative of Plaintiff's ineffectiveness as a manager.

23        The modulator prototype was eventually tested in April 2002, around the time of Plaintiff's

24 departure from Lumera. Then in August 2002, Lumera "announced successful completion" of the

25 modulator prototype, and Plaintiff claims that his work significantly contributed to achievement of this

26 ORDER – 6

1   goal at Lumera.  (Pl.'s Opp'n 13.)  Plaintiff suggests that the failure to test the prototype sooner was for

2   reasons unrelated to his own performance or competence—including Lumera's lack of needed staff,

3   materials, and facilities and the unpredictability of the science involved.  (*Id.* at 11–13.)  Mr. Mino claims

4   that missing this deadline was just the latest in a series of events that led him to conclude by February 25,

5   2002 that Plaintiff "should be taken out of a management position and put in a non-management role."

6   (Defs.' Mot., Mino Decl. ¶ 27.)

7        Plaintiff not only disputes the veracity of Mr. Mino's stated legitimate reasons for removing

8   various aspects of Plaintiff's responsibilities and ultimately terminating him, he also alleges specific

9   discriminatory incidents and practices, including social events involving alcohol, comments perceived to

10   be about Plaintiff's religion, and the assertion that Plaintiff's lesser role at Lumera was due to his "looking

11   Arab."

12        Informal social gatherings of the Lumera employees are one source of Plaintiff's discrimination

13   claims.  As a devout Muslim, Plaintiff cannot consume alcohol or be in environments where alcohol is

14   served if the people he is with are drinking.  Lumera employees often gathered at the Mainstreet Ale

15   House or Red Hook Brewery, but Plaintiff did not attend these events, either before or after Mr. Mino

16   arrived.  Mr. Mino encouraged continuation of these gatherings, viewing them as team-building social

17   affairs.  Mr. Mino or Lumera paid for these events, and if Mr. Mino was not present, employee Tim

18   Londergan would "pick up the tab and would be reimbursed by Lumera."  (Pl.'s Opp'n 7.)

19        Attendance at the pub events was not "mandatory" but Plaintiff alleges that he felt that he was

20   excluded because everyone knew he could not attend.  In the fall of 2001, Plaintiff expressed concern

21   about the pub gatherings' increasing frequency.  Plaintiff acknowledged that social events were needed

22   for the team, but Defendant alleges that Plaintiff—as a manager—did not take it upon himself to plan

23   such events that did not include alcohol.  At some point a suggestion was made that the team include

24   yogurt-shop or juice-bar events that did not involve alcohol, although *both* Plaintiff and Mr. Mino take

25   credit for this idea and dispute with whom it originated.  Further, Plaintiff claims that Mr. Mino said that

26   ORDER – 7

1   he would have social events at other locations, but never did.  (Defs.' Mot., Curran Decl. Ex. K (Lahrichi

2   Dep.) 208:22–209:16.)  Mr. Mino says that he did not proceed with the idea because Plaintiff thought it

3   would be unpopular with the team.  (*Id.*, Mino Decl. ¶ 12.)  Despite this argument about whose idea the

4   yogurt/juice option was or was not, it is undisputed that no change to this effect ever was made.  Even

5   though no change in happy hour venue occurred, however, it is undisputed that Mr. Mino purchased a

6   Ping Pong table and a foosball table for the Lumera office to promote informal interactions among

7   employees and that there were occasional potluck lunches that were alcohol-free.  Plaintiff only

8   remembers one of these lunches, and it appears that he attended it.  (Pl.'s Opp'n, Lahrichi Decl. ¶ 11.)

9   Plaintiff also declares that he had lunch and went on walks with employees.  (*Id.*)

10          Nevertheless, Plaintiff's perspective is that alcohol-related events pervaded the Lumera social

11  scene, including dinners at Mr. Mino's home, dinners for work-related occasions in town, and dinners "on

12  the road" when employees traveled.  (Pl.'s Opp'n 7–8.)  Further, Plaintiff is not the only employee who

13  felt pressured to go to the Mainstreet Ale House or Redhook Brewery—Sheila Hadersberger, Lumera's

14  Assistant Controller, felt such pressure to attend when she was pregnant, after her nonattendance came

15  up at her performance review.  (Ms. Hadersberger also expressed concern to Mr. Mino about favoritism

16  and the financial impact on Lumera of the company paying for these events.)  However, it is also

17  undisputed that not *all* Lumera employees attended—others besides Plaintiff and Ms. Hadersberger

18  declined to attend pub events.  Still, Plaintiff alleges that Mr. Mino was "frustrated" by Plaintiff's

19  nonattendance at the happy hour events.  Defendants dispute this, noting that Plaintiff bases his

20  perception about Mr. Mino's feelings on *Mr. McIntyre's* statement to Plaintiff, made "along the lines that

21  [Mr. McIntyre] could understand that [Mr. Mino] might be frustrated" that "one of the key employees

22  would not participate in team building events."  (*Id.*, Frank Decl. Ex. 8 (McIntyre Dep.) 161:25–162:5.)

23          Finally, Mr. Mino had a housewarming party on January 29, 2002 that he agreed to host alcohol-

24  free for the first two hours so Plaintiff could attend.  (Defs.' Mot., Curran Decl. Ex. K (Lahrichi Dep.)

25  211:12–22.)  Plaintiff testified in his deposition that, on the day of the party, Mr. Mino told him not to

26  ORDER – 8

1  attend. (*Id.* at 211:22–23.)  However, Defendants point out that Plaintiff told the EEOC that *another*

2  *employee* told him he could not attend. (*Id.*, Curran Decl. Ex. J.)  Dianne Edfast, the Lumera employee

3  named as the one who said this, claims that Mr. Mino might have said "in passing" that Plaintiff "could

4  not attend the party." (*Id.*, Edfast Decl. ¶ 2.)  Plaintiff's instant declaration is that, in responding to Ms.

5  Edfast's statement that she could not attend the party, Mr. Mino said "Adil will also not come to my

6  party," and that Plaintiff discussed it with Ms. Edfast thereafter. (Pl.'s Opp'n, Lahrichi Decl. ¶ 17.)

7  Thus, even Plaintiff's evidence on this incident is conflicting.

8          In addition to the Lumera socializing involving alcohol, Plaintiff relies on several verbal

9  interactions between himself and Mr. Mino that he believes prove Mr. Mino's discriminatory intent.  The

10 first of these is the "sweatshop" comment—the context of which involves a July 2001 discussion while

11 *Mr. Mino* was being interviewed by Lumera (and Plaintiff), during which Mr. Mino allegedly said in

12 reference to Plaintiff, "Look at this guy who drags his pregnant wife from Colorado and dumps her in a

13 sweat shop." (Pl.'s Opp'n, Lahrichi Decl. ¶ 31.)  Plaintiff believed the "sweatshop" comment was

14 religiously motivated, and the implication was that "Muslim people slave their wives." (Defs.' Mot.,

15 Curran Decl. Ex. K (Lahrichi Dep.) 206:2.)

16         A second incident involved a conversation about September 11, 2001 that occurred soon after

17 Plaintiff returned from his vacation in October 2001.  Plaintiff declares that Mr. Mino "grilled" him about

18 Osama Bin Laden and the World Trade Center in a "provocative and intrusive" manner. (Pl.'s Opp'n,

19 Lahrichi Decl. ¶ 34.)  Plaintiff felt attacked and like he had to defend himself and Islam. (*Id.*)  The

20 conversation contrasted to a "collegiate and educational" one that Plaintiff had had with Mr. McIntyre on

21 the subject of September 11, 2001. (Defs.' Mot., Curran Decl. Ex. K (Lahrichi Dep.) 207:12–13.)

22 However, the record contains no specifics about the conversation or examples of statements made

23 therein.

24         A third incident involved a statement "about God," which Mr. Mino made in a December 2001

25 meeting and which Plaintiff found offensive.  Plaintiff claims that the statement was "We are the gods,"

26 ORDER – 9

while Mr. Mino maintains that he said "It's good to be king," which is a quote from a movie.  (Defs.'

Mot., Mino Decl. ¶ 34.)  Plaintiff found this comment offensive, and told Mr. Mino so.

A fourth incident involved Mr. Mino inviting Plaintiff and Plaintiff's wife to dinner in January

2002.  Plaintiff declined the invitation, explaining that his "wife will not be able to come to dinner because

she doesn't see other men."  (Pl.'s Opp'n, Frank Decl. Ex. 6 (Lahrichi Dep.) 204:3–5.)  Apparently, this

was an explanation of their cultural practice that women cannot socialize with men who are not family

members.  Plaintiff testified that Mr. Mino "was not happy with that" (*id.* at 204:5–6), and, in response to

Plaintiff's explanation about dinner, Plaintiff testified to the following:

> [Mr. Mino] told me a story about his friend in Pakistan whom he visited, and that his
> father is a fundamentalist, but the child is open.  And once he called his girl and his father
> that was fundamentalist was irritated, and he said that his friend was more westernized
> than I am.

(*Id.* at 204:7–12.)  When asked what bothered him about the statement, Plaintiff said, "It bothered me

because we had—don't have to be compared to fundamentalists or westernized."  (*Id.* at 204:17–18.)  He

added, "If I tell somebody that my wife is not able to attend dinner, it should be understanding and should

not be an issue."  (*Id.* at 204:18–20.)  Apparently, Mr. Mino "thought that was just [Plaintiff's] belief

system that he wanted to be with his family."  (*Id.* Ex. 9 (Mino Dep.) 239:22–23.)

The fifth comment involved a conversation about Valentine's Day traditions.  Apparently, Mr.

Mino gave roses to female Lumera employees and chocolates to male Lumera employees on Valentine's

Day 2002.  Unsure of whether to give chocolates to Plaintiff, Mr. Mino discussed Valentine's Day with

Plaintiff.  (Defs.' Mot., Mino Decl. ¶ 38.)  Plaintiff had walked into a conversation between Mr. Mino and

another employee who were talking about Valentine's Day, and Mr. Mino allegedly said to Plaintiff, "in

America, you kiss and date, but you don't know that in your world."  (Pl.'s Opp'n, Frank Decl. Ex. 6

(Lahrichi Dep.) 203:10–15.)  Plaintiff acknowledges that this is true, but again believes that it was

religiously motivated and found the reference to "your world" offensive.  (*Id.* at 204:1.)

//

ORDER – 10

In addition to the comments described above, Plaintiff claims that Mr. Mino kept him "in the background, out of sight" (Pl.'s Opp'n 21) because of his "long, untrimmed beard" and "dominant Arabic features, including dark hair and skin" and "large nose" (*id.* at 22; *id.*, Lahrichi Decl. ¶ 4).  As evidence of this treatment, Plaintiff points to Mr. Mino's decisions to treat non-Muslim, non-Arab employees to dinners, invite them to business meetings, and take them on business trips.  (*Id.*, Frank Decl. Ex. 9 (Mino Dep.) 148–151.)  Mr. Mino responds that he took chemists on three trips because of their specific expertise, and that a fourth trip that involved several Lumera employees giving presentations in mid-March 2002 did not include Plaintiff because Plaintiff had the flu and his son was ill at that time.  (Defs.' Reply, Mino Supp. Decl. ¶¶ 2–3.)  Plaintiff also focuses on his exclusion from meetings with investors and potential investors and Lumera's Board of Directors as evidence of discrimination, noting that "Caucasian[], clean-shaven" employees who drank alcohol with Mr. Mino did attend such meetings.  (Pl.'s Opp'n, Lahrichi Decl. ¶¶ 42–43.)  Defendants emphasize that Plaintiff can recall only one board meeting that he did not attend out of the total of two such meetings that occurred while Plaintiff and Mr. Mino both worked at Lumera (Defs.' Mot., Curran Decl. Ex. K (Lahrichi Dep.) 202:2–12) and one occasion where he did not meet with investors, with Plaintiff testifying that Mr. Mino told him that he would not be meeting with the investors (*id.* at 207:24–208:14).  There is no evidence of any statements made by anyone at Lumera about Plaintiff's physical traits.

A further allegation of discrimination involves Plaintiff's discussion with Mr. Mino about a confrontation between two Lumera employees, Lou Bintz and Jeffrey Kressbach.  Mr. Mino thought that Plaintiff's rendition of the conflict was overly sympathetic to Mr. Kressbach, and Mr. Mino suggested that Plaintiff might be biased against Mr. Bintz.  Plaintiff testified that he thought this allegation was related to his religion because "I am not trustworthy."  (Defs.' Mot., Curran Decl. Ex. K (Lahrichi Dep.) 218:20.)

To show that other non-Muslim, non-Arab employees were not treated like Plaintiff, he emphasizes that another employee—Mr. Bintz—who was more "disruptive and difficult" was kept

ORDER – 11

1   around longer than Plaintiff despite that his behavior was allegedly worse than Plaintiff's.  (Pl.'s Opp'n

2   9–10.)  While Defendants do not dispute that Mr. Bintz is a "challenging employee" (Defs.' Reply 4),

3   they emphasize that Mr. Bintz has never held a management position at Lumera (*id.*, Mino Supp. Decl. ¶

4   4).

5          It is undisputed that Plaintiff complained internally about many of the issues discussed *supra*.  He

6   specifically talked to Mr. McIntyre and Mr. Mino about his concerns.  However the level and character of

7   his complaints are disputed.  Plaintiff expressed concerns to Mr. McIntyre several times, beginning in the

8   fall of 2001.  (Defs.' Mot., McIntyre Decl. ¶¶ 15–17.)  On the first occasion, Mr. McIntyre urged Plaintiff

9   to discuss his concerns about the alcohol-related events with Mr. Mino himself.  (*Id.* ¶ 15.)  In January

10  2002, Plaintiff again raised concerns about feeling excluded from Lumera social events involving alcohol,

11  indicating that he "felt isolated from his staff" and "[leading Mr. McIntyre] to believe that [Plaintiff]

12  feared that his job might be in jeopardy."  (*Id.* ¶ 16.)  However, Mr. McIntyre declares that Plaintiff

13  "specifically did not tell [him] that he felt discriminated against or harassed, as I am certain . . . that I

14  would have remembered the use of such words had it occurred."  (*Id.*)  In contrast, Plaintiff declares that

15  he did specifically complain to Mr. McIntyre about discrimination and harassment based on Plaintiff's

16  religious beliefs and his Arab appearance.  (Pl.'s Opp'n, Lahrichi Decl. ¶ 48.)  Again, Mr. McIntyre urged

17  Plaintiff to talk to Mr. Mino.  Plaintiff requested that Mr. McIntyre keep the conversation confidential.

18  (Defs.' Mot., McIntyre Decl. & Ex. C (email from Plaintiff requesting to keep the conversation

19  confidential).)  Plaintiff claims that this confidentiality request was made out of fear of "reprisal."  (Pl.'s

20  Opp'n, Lahrichi Decl. ¶ 48.)

21         In addition to denying that any of the above can support Plaintiff's allegations of discrimination,

22  Defendants also point out how Lumera accommodated Plaintiff's religious practices.  For example,

23  Plaintiff was allowed to pray in his office with the door closed several times daily; Plaintiff was allowed to

24  leave at noon on Fridays for religious services; and Plaintiff's religious practice of not shaking women's

25  hands was honored.  (Defs.' Mot., Mino Decl. ¶ 11.)  Plaintiff does not dispute that these

26  ORDER – 12

1   accommodations were made.

2       Finally, Plaintiff urges the Court to view his discrimination claims "through the prism of 9/11"

3   (Pl.'s Opp'n 2), noting that Plaintiff's problems with Lumera escalated sharply after his return to Lumera

4   in October 2001 following his vacation absence during the whole month of September 2001.  Defendants,

5   on the other hand, claim that the proximity to 9/11 of Plaintiff's deteriorating relationship with Lumera is

6   simply a coincidental product of Mr. Mino's September 4, 2001 start date and Mr. Mino's quick

7   recognition of preexisting problems with Plaintiff's performance at Lumera.  (Defs.' Reply 6–7.)

8       On February 25, 2002, Mr. Mino and Plaintiff had lunch, at which Mr. Mino had planned to tell

9   Plaintiff about his "decision to reassign him to a non-management, individual contributor role."  (Defs.'

10  Mot., Mino Decl. ¶ 28.)  However, Mr. Mino "held back."  (*Id.*)  Then, that afternoon, Plaintiff learned

11  that his three-year-old son had been diagnosed with leukemia.  (*Id.*; Pl.'s Opp'n, Lahrichi Decl. ¶ 51.)

12  Plaintiff worked from home or the hospital during the several weeks he was away from the office after the

13  diagnosis.  Mr. Mino's declaration is that on March 28, 2002, he met with Plaintiff to inform him that he

14  was being removed from a management role.  (Defs.' Mot., Mino Decl. ¶ 29.)  Mr. Mino told Plaintiff

15  that he could take two months off, with pay, to care for his son if he wanted.  (*Id.*; *id.*, Curran Decl. Ex.

16  K (Lahrichi Dep.) 185:16–19.)  Plaintiff's recollection of this meeting is that he was told that he had to

17  leave the company, and that he might be allowed to come back as an "individual contributor" after being

18  away from Lumera for a couple of months.  (Pl.'s Opp'n, Lahrichi Decl. ¶ 52.)  Plaintiff alleges that

19  during the meeting, Mr. Mino said he wanted to "erase [Plaintiff's] shadow."  (Pl.'s Opp'n 23.)

20      The parties dispute the content of further severance meetings on April 3 and 4, 2002, but it is

21  undisputed that a severance package was discussed.  It is also undisputed that Lumera agreed to pay for

22  COBRA insurance for Plaintiff and his family, and that this agreement was communicated by Mr. Mino.

23  Plaintiff alleges that Lumera employee Cliff Bickford (Lumera Manager, Recruiting and Human

24  Resources) later told him during severance discussions that if he did not sign a release of claims

25  agreement, he would receive no benefits, including COBRA insurance benefits.  (*Id.*, Lahrichi Decl. ¶ 59.)

26  ORDER – 13

1   However, even though Plaintiff refused to enter into the requested releases, he did receive COBRA

2   benefits, with the premiums paid by Lumera as promised by Mr. Mino.  While Plaintiff received COBRA

3   insurance, notice of that coverage did not reach Plaintiff until December 2002.  Mr. Bickford, not Mr.

4   Mino, was the Lumera employee responsible for distributing COBRA notices.  (Defs.' Mot., Bickford

5   Decl. ¶ 2.)  Plaintiff's last day at Lumera was April 12, 2002.

6   **II.    APPLICABLE STANDARD**

7        Rule 56 of the Federal Rules of Civil Procedure governs summary judgment motions, and

8   provides in relevant part, that "[t]he judgment sought shall be rendered forthwith if the pleadings,

9   depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show

10  that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as

11  a matter of law."  FED. R. CIV. P. 56(c).  In determining whether an issue of fact exists, the Court must

12  view all evidence in the light most favorable to the non-moving party and draw all reasonable inferences

13  in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50 (1986); *Bagdadi v. Nazar*,

14  84 F.3d 1194, 1197 (9th Cir. 1996).  A genuine issue of material fact exists where there is sufficient

15  evidence for a reasonable fact-finder to find for the non-moving party. *Anderson*, 477 U.S. at 248.

16       The Court may not "make credibility determinations or weigh the evidence." *Reeves v.*

17  *Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000).  The inquiry is "whether the evidence

18  presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one

19  party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52.  While the Court "should review

20  the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not

21  required to believe." *Reeves*, 530 U.S. at 151.

22       The moving party bears the burden of showing that there is no evidence which supports an

23  element essential to the non-movant's claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Once

24  the movant has met this burden, the non-moving party then must show that there is in fact a genuine issue

25  for trial. *Anderson*, 477 U.S. at 250.  In order to defeat a motion for summary judgment in an

26  ORDER – 14

1   employment discrimination case, the non-moving party must make more than conclusory allegations,

2   speculations or argumentative assertions that material facts are in dispute. *Wallis v. J.R. Simplot Co.*, 26

3   F.3d 885, 890 (9th Cir. 1994).

4   **III.   ANALYSIS**

5   **A. Hearsay Evidence**

6         Plaintiff objects to "hearsay evidence" in the summary judgment motion and supporting

7   documents filed by Defendants Lumera and Mino.  (Pl.'s Opp'n App. A (Motion to Strike Hearsay

8   Evidence in Defendants' Lumera Corporation and Thomas D. Mino's Motion for Summary Judgment and

9   Supporting Documents).)  The Court DENIES the motion to strike the challenged evidence, and notes

10   that it will only consider hearsay evidence for admissible purposes, and not as proof of the matter

11   asserted, in ruling on the instant motion.

12   **B. Statutory Discrimination Claims**

13         Plaintiff has brought race and religious discrimination claims under Title VII of the Civil Rights

14   Act of 1964, § 703, 42 U.S.C. § 2000e-2; the Washington Law Against Discrimination ("WLAD"),

15   WASH. REV. CODE 49.60; and 42 U.S.C. § 1981.  There are two models applicable to such discrimination

16   cases—the *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), burden-shifting framework and

17   the "mixed-motives" framework that was established in *Pricewaterhouse v. Hopkins*, 490 U.S. 228

18   (1989), and reaffirmed in the Civil Rights Act of 1991, § 107 (Title VII, § 703(m), 42 U.S.C. § 2000e-

19   2(m)).[1]

20

21         [1]  The summary judgment analysis under Washington law and federal law is the same. *Anderson*

22   *v. Pac. Mar. Ass'n*, 336 F.3d 924, 925 n.1 (9th Cir. 2003) (The WLAD "tracks federal law.").  Similarly, the initial analysis under Title VII and § 1981 is the same. *Gay v. Waiters' and Dairy Lunchmen's*

23   *Union*, 694 F.2d 531, 539 (9th Cir. 1982) ("[A] plaintiff may establish a prima facie case of intentional discrimination in employment under section 1981 upon proof of facts which would establish a prima facie

24   case of disparate treatment under Title VII, pursuant to the four *McDonnell Douglas* elements or otherwise.")  Therefore, the Court will engage in a single analysis to resolve the instant motion as to

25   claims brought under all three statutes.

26   ORDER – 15

Under *McDonnell Douglas*, Plaintiff can survive summary judgment only if he meets his initial burden to set forth a *prima facie* case of unlawful discrimination.  411 U.S. at 802.  This involves showing that

> (1) he is a member of a protected class; (2) he was qualified for his position; (3) he experienced an adverse employment action; and (4) similarly situated individuals outside his protected class were treated more favorably or other circumstances surrounding the adverse employment action give rise to an inference of discrimination.

*Peterson v. Hewlett–Packard Co.*, 358 F.3d 599, 603 (9th Cir. 2004).  Plaintiff's success establishing a *prima facie* case "creates a rebuttable presumption that the employer unlawfully discriminated." *Dominguez-Curry v. Nevada Transp. Dep't*, 424 F.3d 1027, 1037 (9th Cir. 2005).  The burden then "must shift to the employer to articulate some legitimate, nondiscriminatory reason" for the adverse employment action.  *McDonnell Douglas*, 411 U.S. at 802.  "If the employer meets this burden, the presumption of unlawful discrimination 'simply drops out of the picture.'" *Dominguez-Curry*, 424 F.3d at 1037 (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993)).  After Defendants meet their burden and the presumption disappears, the burden shifts back to Plaintiff.  At this stage, Plaintiff "must produce sufficient evidence to raise a genuine issue of material fact as to whether [Defendants'] proffered nondiscriminatory reason is merely a pretext for discrimination" in order to survive summary judgment under the *McDonnell Douglas* framework.  *Id.*; *see also Wallis*, 26 F.3d at 890.  There are two ways Plaintiff may show pretext—either (1) directly, "by showing that unlawful discrimination more likely motivated the employer" or (2) indirectly, "by showing that the employer's proffered explanation is unworthy of credence because it is inconsistent or otherwise not believable." *Dominguez-Curry*, 424 F.3d at 1037; *see also Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981).

The *McDonnell Douglas* burden-shifting framework is also referred to as a "single-motive" analysis.  *Id.* at 1041.  Under its alternative, the "mixed-motives" framework, "an unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was *a motivating factor* for any employment practice, even though other factors also motivated the

ORDER – 16

practice." 42 U.S.C. § 2000e-2(m) (emphasis added).[2]  Thus, even if an employee cannot show that discrimination was the *only* motivator under *McDonnell Douglas*, discrimination may be established even though it is coupled with legitimate reasons for the adverse employment action.  In order to survive summary judgment under the mixed-motives framework, Plaintiff must raise a genuine issue of fact such that "a reasonable factfinder could conclude that the hiring decision was motivated at least in part" by discrimination.  *Dominguez-Curry*, 424 F.3d at 1041.  Further, that an employer may have made the same employment decision in the absence of discrimination does not in turn mean that the employer may escape liability for violating Title VII.  *Id.*

        Despite the existence of these two avenues of analysis, the "employee's ultimate burden of proof in all cases remains the same: to show by a preponderance of the evidence that the challenged employment decision was 'because of' discrimination."  *Costa v. Desert Palace, Inc.*, 299 F.3d 838, 857 (9th Cir. 2002), *aff'd*, *Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003).  Thus, when responding to a summary judgment motion, a Title VII plaintiff may choose whether to proceed under *McDonnell Douglas*, the mixed-motives framework, or both.  *Dominguez-Curry*, 424 F.3d at 1037.  The Court need only decide whether there is a possibility of mixed-motives before submitting the case to a jury.  *Stegall v. Citadel Broad. Co.*, 350 F.3d 1061, 1071 (9th Cir. 2004).  Therefore, at this early phase, it is inappropriate for the Court to decide which model better fits this case, and the Court accordingly will

---

        [2]  In response to Defendants' raising of the issue (Defs.' Reply 2 n.1), the Court notes that under Washington law, the mixed-motives test is slightly different, requiring that a jury find that unlawful discrimination was a "substantial factor" rather than the federal "motivating factor."  *Zhang v. Am. Gem Seafoods, Inc.*, 339 F.3d 1020, 1029–30 (9th Cir. 2003) (discussing the difference between federal and state mixed-motives jury instructions' uses of these terms).  However, this difference is insignificant.  The Supreme Court of Washington made clear that the "substantial factor" test is far less demanding than a "but for" test when it rejected jury instructions that had required a finding that discrimination was the "determining factor" for an adverse employment action under section 49.60.180 of Washington's code.  *McKay v. Acorn Custom Cabinetry, Inc.*, 898 P.2d 284, 286–89 (Wash. 1995).  Thus, the federal "motivating factor" and state "substantial factor" mixed-motives tests are functionally equivalent for purposes of summary judgment.  Both tests contemplate discrimination's presence among legitimate reasons for an adverse employment action, and neither test requires that the discrimination be the greater factor or the determining factor.

ORDER – 17

1   consider both. *Dominguez-Curry*, 424 F.3d at 1042 n.7.

2       The "degree of proof necessary to establish" a *prima facie* case at summary judgment is

3   "'minimal.'" *Dominguez-Curry*, 424 F.3d at 1037.  Moreover, Defendants concede, for purposes of

4   summary judgment, that Plaintiff *can* make out a *prima facie* case.  Thus, the Court presumes that

5   Plaintiff has met this threshold burden and accordingly moves on to determine whether Defendants have

6   met their burden to show nondiscriminatory reasons for the adverse employment action against Plaintiff.

7       Defendants' evidence, as set forth *supra*, is that Plaintiff was, in Mr. Mino's eyes, an ineffective

8   manager who was not succeeding at Lumera in his role as Vice President of Technology Development.

9   Mr. Mino thought that Plaintiff's leadership was insufficient to keep him in a management role (or at the

10  company at all, assuming that he was terminated).  Mr. Mino perceived that Plaintiff's behavior was

11  partially responsible for the departure of chemist Henry Hu.  Mr. Mino was not satisfied with Lumera's

12  progress, and he observed enough employee interactions and heard enough complaints to make the

13  connection in his mind that the technical team could be more efficient with a better leader.  Even viewing

14  this evidence in the light most favorable to Plaintiff, the Court finds that Defendants have set forth

15  sufficient nondiscriminatory grounds for terminating and/or demoting Plaintiff.  While Plaintiff raises

16  factual questions about some of the individual complaints, Plaintiff does not dispute the key facts set forth

17  by Defendants—including that he engaged in heated confrontations with employees, including Mr. Hu,

18  and that Lumera's new CEO had the power to adjust Plaintiff's job duties in accordance with the new

19  management structure at the company and his perception of the needs of the company in terms of team

20  morale and leadership.

21      Having determined that Defendants have met their burden to articulate some legitimate,

22  nondiscriminatory reason for the adverse employment action, the presumption of unlawful discrimination

23  "drops out of the picture."  The Court therefore turns to Plaintiff's burden to produce sufficient evidence

24  to raise a genuine issue of material fact showing either that Defendants' stated legitimate reasons are

25  pretextual (under the single-motive framework) *or* that, even if not all stated legitimate reasons must fail,

26  ORDER – 18

1  that discrimination nevertheless "motivated" Mr. Mino's actions to some degree (under the mixed-

2  motives framework).

3          In proffering evidence on summary judgment under either the single-motive or the mixed-motives

4  theory, an employee's evidence may be either direct *or* circumstantial.  *Desert Palace*, 539 U.S.

5  at 101–02;[3] *Becker v. Cashman*, 114 P.3d 1210, 1213 (Wash. 2005).[4]  Direct evidence is that, which, "'if

6  believed, proves the fact [of discriminatory animus] without inference or presumption.'"  *Dominguez-*

7  *Curry*, 424 F.3d at 1038 (quoting *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1221 (9th Cir. 1999)).

8  When an employee relies on *circumstantial* evidence, which requires an inferential step, such

9  circumstantial evidence must be both *specific* and *substantial*.  *Id.*  Plaintiff relies on circumstantial

10 evidence in this case (*see* Pl.'s Opp'n 17–18), so he must produce specific and substantial evidence in

11 opposing summary judgment.

12         To survive summary judgment, Plaintiff must raise a genuine issue of material fact that would

13 show that Defendants' reasons were pretextual or, even if some of Defendants' reasons were legitimate,

14 that discrimination *also* motivated the adverse employment action.  Specifically, under the single-motive

15 framework, Plaintiff may show pretext indirectly, by raising a genuine issue of material fact that could

16 show at trial that Mr. Mino's and Lumera's "proffered explanation is unworthy of credence" or directly,

17 by raising a genuine issue of material fact that could prove at trial that unlawful discrimination "more

18 likely" motivated Mr. Mino and Lumera.  Under the mixed-motives framework, Plaintiff may survive

19

20         [3]  The *Desert Palace* Court noted that "'[c]ircumstantial evidence is not only sufficient, but may

21 also be more certain, satisfying and persuasive than direct evidence.'"  539 U.S. at 100 (quoting *Rogers v.*
*Missouri Pac. R. Co.*, 352 U.S. 500, 508 n.17 (1957)).

22         [4]  Defendants' unsupported assertion (Defs.' Reply 2 n.1) that "direct evidence" is required under

23 Washington law is meritless.  The *Becker* court specifically addressed this issue, noting that an
employee's burden to show that a reasonable trier of fact could find that discrimination was a "substantial

24 factor motivating the employer's adverse actions" is a "'burden of production, not persuasion, and may
be proved through direct or circumstantial evidence.'"  114 P.3d at 1213 (quoting *Riehl v. Foodmaker,*

25 *Inc.*, 94 P.3d 930, 937 (Wash. 2004)).

26 ORDER – 19

1    summary judgment by raising a genuine issue of material fact that could show at trial that discrimination

2    motivated Defendants, regardless of any legitimate reasons for their action.

3          As to whether Defendants' explanations are worthy of credence, the Court finds that Plaintiff has

4    failed to raise a genuine issue of material fact that could show at trial that Defendants had no legitimate

5    reasons for firing or demoting him.  Plaintiff's first bit of purported evidence as to pretext consists of his

6    evidence that he was doing a good job.  While Plaintiff may have raised an issue of fact as to the level and

7    quality of his performance at Lumera, *that* issue of fact is *not material* for purposes of summary

8    judgment.  Assuming that Plaintiff was doing a good job in his own opinion and the opinions of some

9    other employees—and even assuming that he was *objectively* doing a good job, he cannot preclude

10   summary judgment on that basis.  The issue is whether Mr. Mino's reasons can be believed from Mr.

11   Mino's subjective perspective, not whether Mr. Mino exercised unsound judgment in the face of

12   Plaintiff's objectively competent performance.  *See Bradley v. Harcourt, Brace & Co.*, 104 F.3d 267, 270

13   (9th Cir. 1996) ("[Plaintiff claimed that] she had been performing her job adequately and had received no

14   feedback indicating otherwise. However, an employee's subjective personal judgments of her competence

15   alone do not raise a genuine issue of material fact."); *Grimwood v. Univ. of Puget Sound*, 753 P.2d 517,

16   519 (Wash. 1988) ("It is the perception of the decision maker which is relevant.") (internal quotations

17   and citations omitted).  It is thus irrelevant that Plaintiff never received complaints from employees

18   directly, and it is equally irrelevant that he may have been doing a good job in his own or anyone else's

19   opinion other than Mr. Mino's.

20         Rather, the issue is whether Plaintiff can show that *all* of Mr. Mino's stated reasons are merely

21   pretextual.  *See Reeves*, 530 U.S. at 146–48.  Here, Plaintiff cannot eliminate all of Mr. Mino's legitimate

22   reasons, even if some are weaker than others.  First, Plaintiff has not challenged the fact that complaints

23   were made about him to Mr. Mino.  Nor has Plaintiff challenged Mr. Mino's observations of his conduct

24   in team meetings that Mr. Mino says eventually led to his termination or demotion.  Though Plaintiff

25   himself disagrees with Defendants' sentiment that he is a "dictatorial" "micromanager," he has not raised

26   ORDER – 20

1   a genuine issue of material fact as to Mino's beliefs about Plaintiff's management skills and practices.

2   Further, Plaintiff concedes that Mr. Mino had the authority to change his job duties in accordance with

3   the new management structure at Lumera, where Mr. Mino was the first CEO and Plaintiff was no longer

4   the highest-ranking Lumera employee.  Plaintiff does not dispute that Mr. Mino had ample opportunity to

5   observe Plaintiff in his management role and assess his effectiveness.  Plaintiff has brought forth no

6   *specific* evidence that Mr. Mino did not receive complaints about staff conflicts.  Nor has he presented

7   any evidence that would tend to show that actual complaints were made with discriminatory motives in

8   mind.

9       As to Mr. Mino's second reason for firing or demoting Plaintiff—his effect on Mr. Hu—the Court

10  finds that Plaintiff has shown that Mr. Hu did not leave *solely* because of Plaintiff.  However, even

11  Defendants acknowledge that Mr. Hu had other reasons for leaving Lumera.  Further, Plaintiff has failed

12  to show that there is a material issue of fact that would show that Mr. Mino could not have based his

13  decision, at least in part, on legitimate conflict between Plaintiff and Mr. Hu that took place before Mr.

14  Hu decided to leave Lumera.  Further, even if Mr. Hu's departure *alone* was not enough to provide a

15  believable and legitimate reason for termination, when it is taken in the context of the general complaints

16  about Plaintiff's management style and the non-hearsay evidence of observations of Plaintiff's behavior as

17  a manager, it is clear that Plaintiff has not raised a material issue of fact that would show at trial that Mr.

18  Hu's departure could not have been one of several factors that legitimately led to the adverse employment

19  action.  Though Plaintiff's evidence on this point is specific (Mr. Hu at least some reasons for leaving

20  unrelated to Plaintiff), it is nevertheless insubstantial.

21      As to Mr. Mino's third reason—Plaintiff missing a deadline—the Court again finds that Plaintiff

22  has failed to raise a material issue of fact that could show at trial that missing the deadline could not have

23  caused the adverse employment action.  Taking the facts in the light most favorable to Plaintiff, it is still

24  true that Mr. Mino's overall assessment of Plaintiff's performance and the ultimate decision to terminate

25  or demote him could validly be based on the technical team's inability to meet this deadline.  This is so

26  ORDER – 21

even if the deadline in question was unrealistic and missing it was due to a combination of factors, some of which were not caused by Plaintiff. It is undisputed that Plaintiff was the *leader* of the technical team and that he was hired to do such things as see projects through to timely completion. Plaintiff has presented evidence that there were multiple reasons for the failure, but he has not presented substantial evidence that Mr. Mino's consideration of the missed deadline could be unworthy of credence.

Thus, the Court finds that when all the evidence is viewed in the light most favorable to Plaintiff, he cannot show that there is a genuine issue of material fact for trial as to the legitimacy of at least some, if not all, of Mr. Mino's and Lumera's reasons for their employment decision adverse to Plaintiff. In other words, Plaintiff cannot show *indirectly* that Defendants' reasons were pretextual due to unbelievability. The other avenue for Plaintiff to raise a genuine issue of material fact as to pretext is *directly*—by showing that discriminatory reasons *more likely* were the reason for his termination. Similarly, Plaintiff may also survive summary judgment by showing that discriminatory reasons existed alongside legitimate ones, as under the mixed motives framework. Therefore, whether there is a genuine issue of material fact as to discriminatory intent will determine whether Plaintiff may proceed to trial on the "direct" pretext showing or the mixed-motives framework. The Court will address both of these possibilities by assessing Plaintiff's proffered evidence of discriminatory intent. As set forth *supra*, Plaintiff alleges that the alcohol-related social gatherings, a set of comments by Mr. Mino, and certain aspects of his employment role are evidence of discrimination because Plaintiff is Muslim and/or of Arab origin.

As to the alcohol-related social events, the Court finds that, taking the facts in the light most favorable to Plaintiff, it is very likely that Plaintiff felt excluded from the Lumera "group" because he could not attend these events due to his religion. Plaintiff raises the point that though these events were not technically required, the fact that Lumera and/or Mr. Mino paid for them is compelling evidence in his favor that they were *de facto* required. Plaintiff also raises the possibility that his lack of attendance at these events contributed to his inability to build and lead his technical team, which in turn supplied one of

ORDER – 22

1   the key "legitimate" reasons for his termination.  However, even if this is true, the Court finds that, in

2   light of the alternatives that were actually available and the fact that Plaintiff—as a manager—could have

3   implemented other activities, Plaintiff's inability to attend the alcohol-related events is not sufficient to

4   create a material issue of fact as to discriminatory *intent* by Mr. Mino and/or Lumera.

5          First, Plaintiff fails to raise any issue of fact that would tend to show that he would have been

6   unable to get alternative events approved and paid for by Lumera.  To the contrary, viewing the facts in

7   the light most favorable to Plaintiff, it is clear that Lumera and/or Mr. Mino paid for games to facilitate

8   at-office interactions, and approved of yogurt-shop or juice-bar outings (either—as Mr. Mino asserts—as

9   Mr. Mino's own idea, or—as Plaintiff asserts—as Plaintiff's idea to which Mr. Mino *did not object*).

10  Further, Plaintiff's activity in leaving for lunches, going for walks with employees, and participating in the

11  potluck lunches were all opportunities for him to build his team.  Thus, the causal connection between the

12  alcohol-related events and the fact that Plaintiff's team was falling apart is tenuous at best.  Moreover, his

13  inability to build his team's morale is only one of several legitimate reasons that led to the adverse

14  employment action.  Plaintiff has not brought forth any evidence that his lack of attendance at happy hour

15  events was the source of *any* of his undisputed clashes with staff or his team's failure to meet deadlines.

16         Nor has Plaintiff alleged that the company initiated or continued the alcohol-related events

17  *because* Plaintiff could not attend.  There is no evidence on the record that Plaintiff's inability to attend

18  drove Lumera's or Mr. Mino's choice of social venue.  To the contrary, Plaintiff's inability to attend

19  prompted discussion of alternatives and the implementation of at least some such alternatives.  Further, as

20  Defendants point out, Plaintiff has not brought a disparate-impact claim.  Thus, if Plaintiff cannot show

21  that the pub outings were evidence of *intentional* discrimination, he cannot support his disparate

22  treatment claim with this evidence.  The Court finds that the alcohol-related social gatherings'

23  continuation even when Lumera decisionmakers knew that Plaintiff could not attend is insufficient to

24  raise an inference of discrimination or supply a genuine issue of fact for trial on the issue of discriminatory

25  intent.

26  ORDER – 23

The Court now turns to the verbal interactions and comments Plaintiff highlights as evidence of discrimination.  The Court notes at the outset that discriminatory comments need not be made in the context of Plaintiff's termination in order to raise a genuine issue of fact as to discriminatory intent.  *Reeves*, 530 U.S. at 152–53.  Thus, the fact that none of the comments on which Plaintiff relies as evidence of discrimination occurred in the context of his termination or demotion is not fatal to his case.

The "sweatshop" comment, while tasteless, particularly because it was made by Mr. Mino while *he* was being interviewed for a job, does not raise a genuine issue of material fact as to discriminatory intent.  First, it was made before Mr. Mino was even a Lumera employee or Plaintiff's supervisor.  Second, it is not clear what Mr. Mino meant by it.  Plaintiff felt the implication was that "Muslim people slave their wives," but that is conjecture.  A reasonable factfinder could not reasonably conclude that the "sweatshop" comment had anything to do with Islam.

The second conversation Plaintiff points to is the one between him and Mr. Mino about September 11, 2001.  Plaintiff alleges that he was being "grilled" and that the conversation was "provocative and intrusive."  However, Plaintiff gives no examples of statements made or excerpts of the conversation.  September 11 was the topic of many conversations in the months following that day.  Without specific evidence of the conversation's content, the Court cannot infer that it is evidence of discrimination.  Plaintiff's conclusory characterization of the conversation, therefore, is too unspecific to provide a material issue of fact for trial as to either racial or religious discrimination.

The nature of the third comment is disputed—Plaintiff says Mr. Mino said "We are the gods," while Mr. Mino only remembers saying "It's good to be king."  For purposes of summary judgment, the Court will presume that Plaintiff's recollection of the comment is correct.  Assuming Mr. Mino said "We are the gods," the Court finds that this comment is insufficient to raise a material issue of fact for trial.  First, the comment is not in and of itself offensive—it obtains its offensive character only by application of the particular religious gloss of Islamic teachings.  There is no evidence that Mr. Mino knew that Muslims would generally find such a comment offensive when he said it.  Moreover, once Plaintiff

ORDER – 24

1  explained to Mr. Mino that he was offended, there is no evidence that Mr. Mino said such a thing again.

2  If he had, that might raise an issue of fact, but no such evidence is before the Court.  In the absence of

3  Mr. Mino's use of this type of phrase *knowing* that it would offend Muslims, the Court finds that no

4  reasonable factfinder could conclude that this phrase, as it was used on this single occasion by Mr. Mino,

5  is evidence of discriminatory intent.

6         The fourth incident involved Mr. Mino's invitation of Plaintiff and his wife to dinner.  Plaintiff

7  told Mr. Mino that his wife could not be around men who are not family.  In response, Mr. Mino told a

8  story about his Pakistani friend who is more "westernized" than Plaintiff but whose father is a

9  "fundamentalist."  Plaintiff felt he was being characterized as a fundamentalist and/or unwesternized.

10  This comment is insufficiently specific or substantial.  First, it was not just about Plaintiff.  Rather it was

11  about Mr. Mino's friend and his friend's father.  There is no evidence that Mr. Mino ever called Plaintiff a

12  fundamentalist.  Further, saying that someone is fundamentalist is not inherently offensive—some people

13  characterize themselves this way.  Nor is it inherently offensive to say that someone in Pakistan is more

14  westernized than someone in the United States, when the context is the level of adherence to conservative

15  cultural practices in any location.  Clearly not all Muslims observe the cultural practice of not allowing

16  women to be in the presence of men who are not family.  Mr. Mino's attempt at conversation may have

17  been insensitive and poorly constructed, but no factfinder could reasonably conclude that it is evidence of

18  religious or racial discrimination.

19         The last comment is the Valentine's Day one—"in America, you kiss and date, but you don't

20  know that in your world."  Plaintiff was offended by Mr. Mino's reference to "your world."  However,

21  given the context and the developing relationship between Mr. Mino and Plaintiff, the Court cannot find

22  that this comment is substantial enough to create a material issue of fact going to discriminatory intent.

23  First, Plaintiff had, only weeks prior to this conversation, told Mr. Mino that his wife could not attend

24  dinner because she could not be around men who are not family.  Given Mr. Mino's knowledge of

25  Plaintiff's and his wife's adherence to certain cultural practices regarding interactions between the sexes,

26  ORDER – 25

1   it would be reasonable for Mr. Mino to then assume that Plaintiff did not "kiss and date."  The "your

2   world" part of the comment shows that Mr. Mino was generalizing, but made in the context of comparing

3   one's cultural traditions in a conversation with someone who is known to observe different cultural

4   traditions than the speaker, it does not rise to the level of discrimination, and no reasonable factfinder

5   could so conclude.  Mr. Mino was pointing out a cultural difference; he was not saying that Plaintiff's

6   cultural practices were inferior.  Finally, the "in America" part of the comment is no doubt obtuse, given

7   that Plaintiff is a United States *citizen* and likely is at the very least casually aware of holidays such as

8   Valentine's Day that are observed in American culture and commercialism.  However, this aspect of the

9   comment merely shows that, as with some of the other examples discussed above, Mr. Mino could use

10  some tact.  His comment about Valentine's Day does not raise a material issue of fact going to

11  discriminatory intent based on Plaintiff's religion or race.

12         Beyond these comments, Plaintiff alleges that Mr. Mino's suggestion that Plaintiff was biased

13  against a Lumera employee's side of a story implied that he was "not trustworthy" because he is a

14  Muslim.  This is totally conclusory and there is no evidence to support such an allegation.

15         As to his appearance, Plaintiff has failed to present any specific or substantial evidence that could

16  show that his appearance or national origin drove any adverse employment action.  Plaintiff's conclusory

17  allegation that he was kept out of sight is not supported by the evidence—that Mr. Mino did not take him

18  on the business trips discussed *supra* is explained by Plaintiff's illness and Lumera's choice to take

19  chemists on trips where their area of expertise was the focus.  Plaintiff's allegation of being excluded

20  from board meetings and investor meetings is also unsupported by the evidence, which shows that the

21  *one* board meeting he did not attend (in March 2002) occurred while his son was newly diagnosed with

22  leukemia and also after Mr. Mino had decided (in February 2002) to reassign him to a non-management

23  role.  Nor was he "excluded" from the investor meeting; rather, Plaintiff was simply not invited to give

24  the tour on that one occasion.  Further, there is *no* evidence in the record that Mr. Mino or anyone at

25  Lumera made any comments about Plaintiff's beard, skin color, hair color, or nose.  (A beard is not an

26  ORDER – 26

"Arab" characteristic in any event—Plaintiff states that his beard is kept untrimmed because he is a Muslim.)  Suggesting that these physical characteristics were on anyone's mind is purely a result of Plaintiff's unsupported speculation.  Accordingly, Plaintiff's physical characteristics are not evidence of race or religious discrimination.

Plaintiff's evidence that the more disruptive Caucasian non-Muslim Lou Bintz was not fired, while true, is immaterial.  Mr. Bintz was not a manager and was not similarly situated to Plaintiff.  Thus, Plaintiff cannot point to how Mr. Bintz was treated as evidence that Plaintiff's treatment resulted from racial or religious discrimination.  Plaintiff and Mr. Bintz had entirely different job descriptions and responsibilities at Lumera.

Plaintiff also urges the Court to consider all of his evidence in light of its proximity to the events of September 11, 2001.  Even doing so, however, the Court cannot find that Plaintiff has presented any specific and substantial evidence of discriminatory intent that raises a genuine issue of material fact that would allow him to present his evidence to a jury.  As discussed *supra*, Plaintiff does not dispute that he was allowed to engage in religious practices at work and that Lumera made accommodations for him. Plaintiff's purported evidence of discrimination may well prove that Mr. Mino is insensitive and that he made some stupid comments.  However, Title VII and WLAD do not provide causes of action against insensitive and rude employers—only discriminatory ones.

For the foregoing reasons, there is no evidence that Plaintiff was discriminated against on the basis of his race or religion that can allow him to survive summary judgment on any of his discrimination claims.  Specifically, Plaintiff has failed to raise any genuine issues of material fact that could show at trial that a discriminatory motive *more likely* was the reason for the adverse employment action (*i.e.*, by directly showing pretext) or that discriminatory reasons existed alongside legitimate ones (*i.e.*, by showing mixed motives).  Accordingly, all of Plaintiff's Title VII and WLAD claims must be dismissed for failure to raise a genuine issue of material fact as to discriminatory intent.  Further, the Title VII claim against Mr. Mino must be dismissed in any event, because individuals cannot personally be held liable

ORDER – 27

1  under Title VII. *Miller v. Maxwell's Int'l Inc.*, 991 F.2d 583, 587–88 (9th Cir. 1993).

2      As to Plaintiff's 42 U.S.C. § 1981 claims, these also fail as a matter of law. Plaintiff, as an Arab-

3  American, clearly is covered by § 1981, which prohibits racial discrimination in making and enforcing

4  public and private contracts. *See Saint Francis College v. Al-Khazraji*, 481 U.S. 604, 609, 613 (1987).

5  Plaintiff may show that he "was subjected to intentional discrimination based on the fact that he was born

6  an Arab, rather than solely on the place or nation of his origin, or his religion" to make out a § 1981

7  claim. *Id.* at 613. However, having failed to prove race discrimination for the purposes of Title VII,

8  Plaintiff also fails to prove race discrimination for purposes of § 1981. *Gay*, 694 F.2d at 539. Therefore,

9  Plaintiff's § 1981 claims must be dismissed.

10  **C. Common Law Emotional Distress Claims**

11      Plaintiff has brought claims against Mr. Mino individually for common law Negligent Infliction of

12  Emotional Distress ("NIED") and Intentional Infliction of Emotional Distress ("IIED").[5] The factual

13  basis for these claims is separate from the factual basis for the statutory discrimination claims discussed

14  *supra.* Specifically, Plaintiff seeks relief for infliction of emotional distress because (1) Mr. Mino

15  allegedly said he wanted to "erase" Plaintiff's "shadow" when he terminated him; (2) Mr. Mino

16  terminated Plaintiff in close proximity to Plaintiff's son being diagnosed with leukemia; (3) Mr. Bickford

17  allegedly told Plaintiff that he could not have COBRA or other benefits unless he signed a release of all

18  claims; and (4) Mr. Mino promised Plaintiff COBRA insurance coverage to be paid by Lumera, but

19  Plaintiff only received notice of such coverage being in effect approximately 8 months after his last day at

20  Lumera.

21  //

22  //

23

24      [5] State law governs diversity cases. *See generally*, *Erie R.R. Co. v. Tompkins*, 304 U.S. 64
(1938). The parties do not dispute that Washington law applies to Plaintiff's common law IIED and

25  NIED claims against Defendant Mino. Accordingly, these claims will be analyzed under Washington law.

26  ORDER – 28

1      ### 1.  Intentional Infliction of Emotional Distress

2      The applicable test for a claim for the tort of IIED, or "outrage," has been defined by the Supreme

3      Court of Washington as follows.  "The basic elements of the tort of outrage are: '(1) extreme and

4      outrageous conduct; (2) intentional or reckless infliction of emotional distress; and (3) actual result to the

5      plaintiff of severe emotional distress.'" *Birklid v. Boeing*, 904 P.2d 278, 286 (Wash. 1995) (citing

6      *Dicomes v. State*, 782 P.2d 1002 (Wash. 1989) (quoting *Rice v. Janovich*, 742 P.2d 1230, 1238 (Wash.

7      1987); RESTATEMENT (SECOND) OF TORTS § 46 (1965))).  Further, "[t]he conduct in question must be *'so*

8      *outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and*

9      *to be regarded as atrocious, and utterly intolerable in a civilized community.' " Id.* (quoting *Grimsby v.*

10     *Samson*, 530 P.2d 291, 295 (Wash. 1975)).  Determining "whether certain conduct is sufficiently

11     outrageous is ordinarily for the jury, but it is initially for the court to determine if reasonable minds could

12     differ on whether the conduct was sufficiently extreme to result in liability." *Id.* (citing *Phillips v.*

13     *Hardwick*, 628 P.2d 506, 510 (Wash. App. 1981)).  Finally,

14         In making the initial determination as to whether the conduct complained of was
           sufficiently extreme to result in liability, a court must consider the following factors:
15         "(a) the position occupied by the defendant; (b) whether plaintiff was peculiarly
           susceptible to emotional distress, and if defendant knew this fact; (c) whether defendant's
16         conduct may have been privileged under the circumstances; (d) the degree of emotional
           distress caused by a party must be severe as opposed to constituting mere annoyance,
17         inconvenience or the embarrassment which normally occur in a confrontation of the
           parties; and, (e) the actor must be aware that there is a high probability that his conduct
18         will cause severe emotional distress and he must proceed in a conscious disregard of it."

19     *Id.* (quoting *Phillips*, 628 P.2d at 510).  The *Birklid* court also noted that the "tort of outrage 'does not

20     extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities'" and that

21     "plaintiffs must necessarily be hardened to a certain degree of rough language, unkindness and lack of

22     consideration." *Id.* (quoting RESTATEMENT (SECOND) OF TORTS § 46 cmt. d).

23     The Court finds that the conduct alleged to support Plaintiff's IIED claim, even when all doubts

24     are resolved in his favor, cannot rise to the level of conduct required by this standard.  First, Mr. Mino's

25     comment about "erasing" Plaintiff's shadow, while insensitive and harsh, is not so extreme as to "go

26     ORDER – 29

1  beyond all possible bounds of decency" as required by the law.  No reasonable jury could so find.  In light

2  of the high level of tensions leading up to the meetings between Mr. Mino and Plaintiff in March and

3  April 2002, the Court cannot find that this single statement could possibly support a verdict in Plaintiff's

4  favor.

5        Second, as to the proximity of the adverse employment action to Plaintiff's son's leukemia

6  diagnosis, the result is the same.  Plaintiff's termination one month after his son was diagnosed does not

7  meet the legal standard for outrage claims.  Nor is there any evidence to support the notion that Mr.

8  Mino fired Plaintiff shortly after his son was diagnosed *because* it would cause him distress.  To the

9  contrary, the evidence shows that, after making the decision in February 2002 but knowing that Plaintiff

10  was already under stress, Mr. Mino waited as long as he could before telling Plaintiff that he wanted to

11  reassign him to a non-management role.  Further, when Mr. Mino did tell Plaintiff about his decision, he

12  offered to pay for COBRA insurance, which Lumera did not have to finance but chose to finance anyway.

13  If anything, this shows that Mr. Mino took steps to minimize distress to Plaintiff.  Such conduct is hardly

14  "reckless" or "intentional."

15        A third circumstance Plaintiff cites in support of his claim is the long span of months between his

16  last day at Lumera and the time he received the notification that COBRA insurance was indeed in effect

17  for him and his family.  There is no evidence that Mr. Mino was responsible for this delay, and Plaintiff

18  does not so allege.  Plaintiff's claim against Mr. Mino for intentional infliction of emotional distress

19  cannot be supported with such evidence when the only thing Mr. Mino actually did in relation to the

20  COBRA coverage was to tell Plaintiff that he could have it.  Similarly, as to the fourth cause of emotional

21  distress, *Mr. Bickford's* alleged threat that Plaintiff would receive no coverage if he did not release all

22  claims against Lumera is irrelevant to Plaintiff's claims against *Mr. Mino*.  Further, even if Mr. Mino had

23  been responsible for the delay in COBRA notification and Mr. Bickford's statement, these instances of

24  conduct could not reasonably be found by a jury to be "atrocious, and utterly intolerable in a civilized

25  community."  Plaintiff's claim for IIED against Mr. Mino must be dismissed as a matter of law.

26  ORDER – 30

### 2. *Negligent Infliction of Emotional Distress*

A cause of action for NIED does exist in Washington, but the traditional tort elements of duty, breach, causation, and damages must be established. *Snyder v. Med. Serv. Corp. of Eastern Washington*, 35 P.3d 1158, 1163–64 (Wash. 2001). Further, "'[n]ot every act which causes harm results in legal liability.'" *Id.* (quoting *Hunsley v. Giard*, 553 P.2d 1096, 1102 (Wash. 1976)). Beginning with duty, the Court notes that there is "no duty for an employer to provide employees with a stress free workplace." *Id.* Further, in Washington, it is established that "'[A]bsent a statutory or public policy mandate, employers do not owe employees a duty to use reasonable care to avoid the inadvertent infliction of emotional distress when responding to workplace disputes.'" *Id.* (quoting *Bishop v. State*, 889 P.2d 959, 963 (Wash. App. 1995)). More specifically,

> "The utility of permitting employers to handle workplace disputes outweighs the risk of harm to employees who may exhibit symptoms of emotional distress as a result. The employers, not the courts, are in the best position to determine whether such disputes should be resolved by employee counseling, discipline, transfers, terminations or no action at all. While such actions undoubtedly are stressful to impacted employees, the courts cannot guarantee a stress-free workplace."

*Id.* (quoting *Bishop*, 889 P.2d at 963). Thus, when the context is an employer's decision about how to resolve an employee dispute, there can be no claim for NIED. *Bishop*, 889 P.2d at 963. However, when the conduct is *not* the result of employer discipline, there *may* be a claim for NIED. *Chea v. Men's Wearhouse, Inc.*, 932 P.2d 1261, 1265 (Wash. App. 1997). Nevertheless, the rule in Washington is that "an employer must be accorded latitude in making decisions regarding employee discipline." *Chea*, 932 P.2d at 1265.

In the instant case, Plaintiff relies on the same four instances to support both his IIED and NIED claims. As with Plaintiff's IIED claim, because two of these four—the delay in receiving notice of COBRA coverage and Mr. Bickford's statement that Plaintiff could not have COBRA coverage if he did not sign releases—were not caused by *Mr. Mino*, Plaintiff cannot rely on them to prove his NIED claim against Mr. Mino as an individual. Plaintiff has not brought an NIED claim against *Lumera*. Thus, his

ORDER – 31

1   NIED claim against Mr. Mino must sufficiently allege a duty owed by Mr. Mino along with a breach by

2   Mr. Mino that proximately caused Plaintiff's damages.  Assuming *arguendo* that a duty exists to timely

3   notify of COBRA coverage and to refrain from making inaccurate statements about the existence of

4   COBRA coverage in the course of severance negotiations, there is no conduct *by Mr. Mino* to constitute

5   breach of such a duty.  There is no evidence that Mr. Mino was responsible for the delay in the COBRA

6   notice, and Plaintiff does not so allege in his opposition to summary judgment.  Rather, it is undisputed

7   that Mr. Bickford was responsible for sending such notices.  Similarly, assuming that Mr. Bickford told

8   Plaintiff that he had to sign a release of claims in order to receive COBRA coverage, there is no evidence

9   that Mr. Mino is responsible for this statement or that he even knew about it.  To the contrary, Mr. Mino

10  specifically told Plaintiff that he *could* have COBRA benefits.  Plaintiff may not allege duty, breach, and

11  causation by various parties in his NIED claim against Mr. Mino alone.

12          The Court now turns to the last two remaining bases for Plaintiff's NIED claim—the timing of

13  Plaintiff's termination and Mr. Mino's comment about "erasing" Plaintiff's "shadow."  These two

14  instances of conduct undeniably were caused by Mr. Mino; the questions here concern the existence of

15  duty and breach under the standard described *supra*.  The Court finds that both the timing of Plaintiff's

16  termination and the language used therein are inherently the result of employer discipline, made in the

17  course of the employer's decision about how to resolve employee disputes.  Thus, the factual scenario

18  required to reach the result in *Chea*—allowing NIED claims when conduct does *not* result from employee

19  discipline—cannot be found in the instant case.  Accordingly, Plaintiff's NIED claim against Mr. Mino

20  must fail as a matter of law under the rule of *Snyder* and *Bishop*, as set forth *supra*, because there is no

21  actionable duty as to conduct that occurs in the course of disciplinary decisionmaking and

22  implementation.

23          In determining that Mr. Mino had no duty "avoid the inadvertent infliction of emotional distress,"

24  the Court relies on the following.  There is no dispute that "employee disputes" pervaded Lumera.  As

25  Lumera's CEO, Mr. Mino decided that, to deal with these matters, he needed to reassign Plaintiff to a

26  ORDER – 32

1    non-management role. This decision was made before Plaintiff's son was diagnosed with leukemia. Mr.

2    Mino had no duty to refrain from *ever* telling Plaintiff about the adverse employment action that he had

3    already decided to implement just because Plaintiff received tragic news about a family member's health

4    before Mr. Mino was able to deliver the news. Mr. Mino had already made his decision regarding

5    Plaintiff's employment status, and in fact *waited* to tell Plaintiff for a month because Plaintiff was dealing

6    with his son's illness. Further, the comment that Mr. Mino made during Plaintiff's termination meeting

7    flows from Mr. Mino's disciplinary decision. While the "erasing shadow" comment may have been

8    insensitive and rude, Mr. Mino had no duty to be nice, given the conversation he was having with Plaintiff

9    when he made it. Specifically, the undisputed context of this comment—the possibility of Plaintiff

10   returning to Lumera after a couple months away—precludes a conclusion that the comment exceeded the

11   scope of the disciplinary action done in response to employee disputes. Because both the timing of the

12   adverse employment action and the comment made during the termination/demotion meeting were

13   inextricably linked to Mr. Mino's disciplinary decision, Plaintiff's claim for NIED must be dismissed.

14         Having determined that no emotional distress claims remain, the Court need not reach

15   Defendants' ERISA preemption argument (*see* Defs.' Reply 11).

16   **D. Microvision's Motion for Summary Judgment**

17         Having determined that all of Plaintiff's claims against Lumera and Mr. Mino must be dismissed

18   as a matter of law, the Court also dismisses Plaintiff's claim against Microvision for negligent supervision.

19   To succeed on this claim under Washington law, Plaintiff must establish (1) that Mr. Mino was acting

20   outside the scope of his employment; (2) that Mr. Mino presented a "risk of danger" or harm to Plaintiff;

21   (3) that Microvision "knew, or in the exercise of reasonable care should have known" that Mr. Mino

22   posed such a risk to Plaintiff; and (4) that Mr. Mino proximately caused Plaintiff's injuries. *Niece v.*

23   *Elmwood Group Home*, 929 P.2d 420, 426–28 (Wash. 1997). Moreover, to bring a claim for negligent

24   supervision in the first instance, Plaintiff must be able to show that he was "injured by some negligent or

25   other wrongful act of" Mr. Mino and/or Lumera—here, torts and/or discrimination. *Haubry v. Snow*, 31

26   ORDER – 33

1  P.3d 1186, 1193 (Wash. App. 2001).  Based on the Court's determinations, *supra*, that no genuine issues

2  of material fact exist for trial on *any* of the wrongful conduct alleged by Plaintiff, there can be no factual

3  basis for a negligent supervision claim.  Specifically, because Plaintiff has not raised a genuine issue of

4  material fact as to discrimination or a tortious act by Mr. Mino and/or Lumera, there is no underlying

5  conduct that he could prove at trial to support his negligent supervision claim.  Accordingly, the negligent

6  supervision claim against Microvision must be dismissed as a matter of law.

7        Because the negligent supervision claim must be dismissed due to lack of any possible finding of

8  underlying wrongful conduct by Mr. Mino and/or Lumera, the Court need not reach the issues raised in

9  the motion papers regarding the nature of Lumera's corporate relationship to Microvision and whether

10  Microvision can be construed as Mr. Mino's "employer" for purposes of a negligent supervision claim.

11        Finally, the Court notes that the issue raised in Plaintiff's Surreply about whether Microvision

12  could exceed its initial motion argument (denying that Microvision knew or should have known that Mr.

13  Mino posed a "risk of harm" to Plaintiff) in its Reply (by then arguing that Mr. Mino was acting within

14  the scope of his employment) is now MOOT, because there is no genuine issue of fact as to the existence

15  of *any* risk of harm, tortious or discriminatory, either within or outside of Mr. Mino's scope of

16  employment.  Nevertheless, the Court notes that it did not rely on any additional arguments in Defendant

17  Microvision's Reply in making this determination.

18  //

19  //

20  //

21  //

22  //

23  //

24  //

25  //

26  ORDER – 34

1

**IV.     CONCLUSION**

2          For the reasons set forth in this Order, Defendants' motions for Summary Judgment are hereby

3    GRANTED, as follows:

4          (1) Defendants Lumera Corporation and Thomas Mino's Motion for Summary Judgment is

5    GRANTED in its entirety for the reasons discussed in sections III.B and III.C, *supra*.  Plaintiff's Title

6    VII, WLAD, and § 1981 claims against Defendants Lumera Corporation and Thomas Mino are hereby

7    DISMISSED.

8          (2) Defendant Microvision's Motion for Summary Judgment is GRANTED on the basis that there

9    is no underlying wrongful conduct to support a claim of negligent supervision, as discussed in section

10   III.D, *supra*.  Plaintiff's negligent supervision claim against Defendant Microvision is hereby

11   DISMISSED.

12         (3) Because no claims remain in this matter, the Clerk is DIRECTED to DISMISS this action.

13         (4) Defendants' Motion to Exclude Testimony of Plaintiff's Proposed Expert Witness, Amelia

14   Derr (Dkt. No. 111) is STRICKEN as MOOT.

15

16         SO ORDERED this 2nd day of March, 2006.

17

18

19                                             John C. Coughenour

20                                             United States District Judge

21

22

23

24

25

26   ORDER – 35